**FILED**

AUG − 6 2007

~~[signature]~~ CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| CHERYL A. BAKER, | \* | CIV. 06-4061 |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| -vs- | \* | REPORT and RECOMMENDATION |
| | \* | |
| MICHAEL J. ASTRUE[1], | \* | |
| Commissioner of Social Security | \* | |
| Administration, | \* | |
| | \* | |
| Defendant. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff seeks judicial review of the Commissioner's final decision denying her a period of disability commencing on May 15, 1999, and payment of disability insurance and medical benefits under Title II and Title XVII of the Social Security Act.[2] The Plaintiff has moved for summary judgment and has requested the Court to enter an order instructing the Commissioner to award

---

[1]Pursuant to 42 U.S.C. 405(g), Michael Astrue has been substituted for JoAnne Barnhart as the named Defendant. Mr. Astrue was sworn in as the Commissioner of the Social Security Administration on February 12, 2007.

[2]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon her "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, the Plaintiff filed her application for both types of benefits at the same time (November 18, 2002). AR 58-60. She ceased working in May, 1999. AR 64, 363. The ALJ found, and the Plaintiff does not dispute that for SSD/DIB purposes, she was insured for disability purposes through December 31, 2004 but not thereafter. AR 20. To be entitled to SSD/DIB benefits, therefore, Plaintiff must be found to have been disabled on or before December 31, 2004. Id. "Impairments arising subsequently, and previously existing impairments which do not progress into a disabling proportion until after December 31, 2004, cannot form a basis of a finding of disability during the required period." AR 20.

benefits. Alternatively, the Plaintiff requests a remand pursuant to 42 U.S.C. § 405(g) sentence four, with instructions to (1) properly evaluate the opinions of her treating and examining physicians; (2) reassess her credibility and subjective complaints; (3) reassess her RFC; and (4) issue a new decision based on substantial evidence in the record as a whole and proper legal standards.

The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended to the District Court that the Plaintiff's Motion for Summary Judgment be GRANTED in part and DENIED in part and that the Plaintiff's case be **REMANDED** to the Commissioner for further proceedings.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and a Standing Order dated November 29, 2006.

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed her application for benefits on November 18, 2002. AR 19, 58-60, 319-329. In a form entitled "Disability Report–Adult" (AR 69-78) Plaintiff listed the following as illnesses, injuries or conditions that limited her ability to work: "neck, back pain, weakness of muscles-sore pressure points–mental condition stress and men." Plaintiff's claim was denied initially in June, 2003 (AR 37, 39-42) and on reconsideration in January, 2004 (AR 38, 45-47). She requested a hearing (AR 48) and a hearing was held on February 14, 2005, before Administrative Law Judge (ALJ) the Honorable Lyle Olson. AR 349-412. Before the hearing, attorney Steve Pfieffer sent the ALJ a letter outlining Plaintiff's claims and alleged medical conditions, along with supplemental medical records for review. AR 55-57. Attorney Pfieffer listed migratory polyarthralgia, swelling, bursal changes, thyromegaly, fatigue, weight gain, thyroid disease, shoulder problems, a deformed, non-functional finger on the right hand, severe back problems, asthma, fibromyalgia, and obesity as the Plaintiff's medical issues. He also asserted a mental health condition regarding Plaintiff's phobia of men. On April 7, 2005, the ALJ issued an eleven page, single-spaced decision affirming the previous denials. AR 19-29. On April 12, 2005, Plaintiff requested the Appeals Council to review the ALJ's decision. AR 15, but the Appeals Council denied review on March 22, 2006. AR 8-11.

Plaintiff then timely filed her Complaint in the District Court on April 3, 2006.

## FACTUAL BACKGROUND

Plaintiff was born on November 1, 1954 and was fifty years old at the time of hearing.  AR 58, 355.[3]  She is a high school graduate with no post-high school education.  AR 360.  Her work history includes a deli cook and a waitress, spanning the years 1985 through 1999.  AR 364-365.  Those jobs required her to be on her feet all day and to lift up to fifty pounds at a time.  AR 365.  Plaintiff quit work in May, 1999 because she just knew she could not do her job anymore.  AR 363.  Her direct supervisor (Mark McMahon) from the grocery store deli where she was last employed (Randall's in Mitchell, South Dakota) submitted an affidavit for the ALJ's consideration on November 4, 2004.  AR 118-119.  He explained that he noticed Plaintiff had a phobia of men, even those she knew well and saw on a regular basis.  AR 118.  She usually worked in the back of the deli with mostly women.  He noticed Plaintiff was very uncomfortable on the rare occasion she had to work the front register, and her limited interaction with male customers was usually only from behind the glass deli counter.  AR 119.  He described Plaintiff as a good worker for the majority of her employment.  AR 118.  Mr. McMahon observed, however that toward the end of Plaintiff's employment, her physical problems interfered with her ability to do her job.  AR 119.  He noticed that she could not stand long enough to complete a shift, and that she did not have the energy or endurance of someone her age.  AR 119.  McMahon said it seemed like "she became a grandma before her time." Id.

Before she discontinued working, Plaintiff sustained an injury to her right fourth finger in 1994, and complained intermittently of right shoulder pain in 1991 and 1992.  AR 151-160.  Plaintiff also suffered knee problems in 1997, which were diagnosed as mild degenerative changes and a medial meniscal tear.  AR 246.  There does not seem to be a record of much, if any, medical treatment from the end of 1997 until after Plaintiff left her job in May, 1999.

Plaintiff received chiropractic care for low back pain in February, 2000.  AR 249.  She went to the Queen of Peace Emergency Room on February 23, 2000 and again on February 29, 2000 for low back pain which extended into her leg.  AR 281.  Plaintiff saw Dr. Brian Tjarks for the low back

---

[3]There is a typographical error in the hearing transcript which indicates Plaintiff's date of birth as 1964.  All other references in the record, including the medical records, indicate the correct year is 1954.

pain on March 6th, 14th, 24th 28th, 2000. Dr. Tjarks prescribed Darvocet and physical therapy. Although his computer generated notes indicate normal physical findings and recommend activities such as walking, swimming and jogging, and that Plaintiff's pain "resolved with normal activity" (AR 202, 205, 284) Dr. Tjarks ordered an MRI of Plaintiff's low back, and referred her to Dr. Frank Alvine for further care. AR 279. The MRI revealed mild spinal stenosis at the L4-5 related to focal asymmetric disc protrusion centrally, ligamentum flavum hypertrophy, and mild hypertropic facet joint artrophathy. There was no evidence of disc herniation at any lumbar level. AR 200.   Dr. Alvine noted 50% normal extension in Plaintiff's right leg and a positive straight leg raising test on the right at 45 degrees. He also noted weakness in her foot dorsiflexors. His impression was lumbar disc disease at the L4-5, with radiculopathy involving the right leg. AR 162. Plaintiff also saw Dr. Greg Alvine on the same date she saw Dr. Frank Alvine (June 30, 2000). AR 167-68. Dr. Greg Alvine noted negative straight leg raising tests in the sitting position but positive in the supine position on the right. AR 168. He noted no pain to deep palpation of the lumbar spine, and no muscle spasm. He reviewed Plaintiff's x-rays and found disc space narrowing and collapse at the L4-5 with mild retrolisthesis of the L4 on 5. He also noted anterior osteophytes. He reviewed the MRI report which cited a focal central disc protrusion at the L4-5 and mild spinal stenosis. AR 168. He suggested a trial of anti-inflammatories and an epidural block, with surgical decompression and fusion as a last resort. AR 167.

In June, 2000 Dr. Greg Alvine suspected Plaintiff's back pain was coming from the L4-5 motion segment. If conservative measures failed, he recommended a discography at L3-4, L4-5 and L5-S-1 and then consideration of surgical fusion with an interbody cage. AR 166. Dr. Alvine ordered EMG nerve studies of the right lower extremity, which were normal. AR 164. The record does not contain further evidence of treatment for low back pain until December, 2003, when Plaintiff received three chiropractic treatments. AR 248.

In September, 2003, Plaintiff received treatment for her right upper extremity. AR 220. Dr. Marcia Nelson noted that Plaintiff had ongoing problems with her right shoulder and with her right ring finger, which she had injured several years earlier. Plaintiff continued to have range of motion issues with the finger and right shoulder pain. Dr. Nelson also noted a fibromyalgia diagnosis from

4

Dr. Dremalske in Sioux Falls. AR 220.[4] Dr. Nelson noted Plaintiff's shoulder abduction was limited to 30 degrees, and her forward flex was 60 degrees, extension was 45 degrees. Plaintiff could not extend her arm behind her back. AR 219. Dr. Nelson also noted damage to the extensor of Plaintiff's right ring finger. Dr. Nelson diagnosed adhesive capsulitis of the shoulder and prescribed medication and physical therapy. Id. After two weeks of physical therapy, a home exercise plan and medication, Plaintiff had not gained much range of motion. AR 216. Dr. Nelson suggested an MRI. The MRI of Plaintiff's right shoulder was performed on November 4, 2003, and showed an undersurface, partial thickness tearing of the rotator cuff. AR 212. Plaintiff returned to see Dr. Nelson after the MRI. Dr. Nelson recommended surgery or a second opinion. AR 210. Plaintiff opted to seek a second opinion with Dr. Matt McKenzie.

Dr. McKenzie saw Plaintiff on November 23, 2003. AR 227. He examined her shoulder and her right ring finger. Id. Dr. McKenzie diagnosed adhesive capsulitis of the right shoulder and a fixed flexion deformity of the right ring finger. He recommended further physical therapy and cortisone injections, but he did not recommend surgical intervention. AR 227. He referred her to one of his partners (Dr. Howey) for treatment of her ring finger.

Dr. Howey examined Plaintiff's finger on January 6, 2004. He noted a boutonniere deformity and very stiff PIP joint resulting in significant interference with the function of her hand. AR 305. Dr. Howey performed same day surgery on Plaintiff's ring finger on January 22, 2004. AR 304. He prescribed physical therapy following surgery, which increased her range of motion in the PIP joint. AR 302. Plaintiff discontinued formal physical therapy in May, 2004, because her insurance coverage was exhausted and she chose to switch to a home program because of "financial implications." AR 264. By August, 2004, Dr. Howey noted Plaintiff's hand had improved, but she was still not getting good active flexion. He predicted further improvement for the next four to six months but that the finger would merely stabilize after that. AR 300. Plaintiff's only other option was a PIP joint fusion, which he did not recommend. Id.

Plaintiff continued to treat intermittently for her shoulder pain during the surgery and therapy for her right ring finger. AR 300-304. Her shoulder symptoms varied during the treatment for her

---

[4]Dr. Tjarks referred Plaintiff to a rheumatologist "Dr. Drymalski" in 1992, (AR 295-96) after he (Tjarks) diagnosed arthritis and continued joint pain in her knees and shoulders, but the record does not contain any of Dr. Drymalski's notes.

finger injury. Id. She received cortisone injections (AR 304), anti-inflammatory medications (AR 302) and she continued a home exercise program. Id. In October, 2004, Dr. McKenzie diagnosed bicipital tendinitis, and treated Plaintiff's ongoing shoulder pain with an injection of Marcaine and Depo-Medrol. AR 300.

Plaintiff saw Dr. Patricia Malters on April 1, 2003 for a disability exam at the request of Disability Determination Services. AR 169. Plaintiff complained of back pain, bilateral knee pain, right shoulder pain, bilateral ankle pain, and bilateral hip pain. Dr. Malters referenced Plaintiff's previous work experience as a cook and a waitress. AR 169. Dr. Malters referred to Plaintiff's pains as polyarthralgia. Id. She noted Plaintiff had puffy skin and was very fatigued. AR 170. She noted marked swelling of both hands and the bursa over the right shoulder, as well as both knees. Dr. Malters also noted an inability to flex the knees and bilateral positive straight leg raising tests. Dr. Malters diagnosed migratory polyarthralgia with swelling and bursal changes, thyromegaly with goiter formation, fatigue and weight gain, and insomnia. She ordered x-rays of the right shoulder and knee and several blood tests. The final paragraph of Dr. Malters' report states, "I feel that the patient meets the criteria for full disability. I do not feel that based on her arthritic changes and probably thyroid disease that she will be able to do anything from the physical work standpoint." She invited Disability Determination Services to call her with any questions. AR 171. There is no indication in the record that DDS ever contacted Dr. Malters for any clarification of her opinions.

Plaintiff saw Dr. Malters again in March, 2004 complaining of back, hip and shoulder pain. AR 315. Dr. Malters prescribed medications (Prev Nap Pak and Celebrex) and asked Plaintiff to return in three months. Plaintiff returned in June, 2004 reporting she did well with the Prev Nap and Celebrex. Those medications were renewed. AR 315. Dr. Malters completed a medical source statement regarding Plaintiff's physical impairment at the request of Plaintiff's attorney in January, 2005. AR 308-313. Dr. Malters indicated Plaintiff had not been able to perform sedentary work on a regular and continuing basis (8 hours per day, 5 days per week). AR 309. Dr. Malters stated Plaintiff could sit one hour at a time in an eight hour day, stand one hour at a time, and walk one hour at a time before changing positions. She also indicated Plaintiff must lie down eight hours total in an eight hour day, could sit one hour total in an eight hour day, stand one hour total in an eight hour day, and walk one hour total in an eight hour day.  Malters also restricted Plaintiff's lifting to one hour of lifting up to five pounds, one hour of lifting up to ten pounds, and no lifting over ten

6

pounds. The same restrictions applied for carrying. Reaching, handling and fingering were limited to thirty minutes per day, as were stooping, kneeling and crouching.  In the space designated for Dr. Malters to describe the aspects of Plaintiff's medical history, clinical findings, lab findings, diagnoses and treatment upon which Dr. Malters based her opinions, she instructed her office staff to send along a copy of her previous disability exam. AR 313.

Plaintiff also saw Dr. Susan Assam at the request of Disability Determination Services on June 11, 2003. AR 174.  Plaintiff reported flu like symptoms (achiness all over) since the 1990's. Dr. Assam reported a diagnosis of fibromyalgia which was treated by nonsteroidal anti-inflammatories.  Dr. Assam also noted Plaintiff had been treated by "Dr. Grymalsoki and Dr. VanDemark, another orthopedic doctor, Dr. Alvine." AR 174. On the day of her exam, she reported pain at a level of 9 out of 10 in her jaw, cervical spine, clavicle, right shoulder, right elbow, left thumb, right ring finger, bilateral hips, knees, medial calves, and right first toe. Id. Dr. Assam also reported Plaintiff had been treated for fibromyalgia and depression. Dr. Assam's physical exam revealed swelling in both knees, crepitus bilaterally but good range of motion. Full range of motion of the hips, knees and ankles, shoulders, elbows and wrists.  Her neck and lumbar spine range of motion were limited. AR 174. Cervical spine x-rays ordered by Dr. Assam revealed modest disc space narrowing with anterior osteophyte formation at C4-5 and C5-6 levels. The films also showed a tilt of the cervical spine toward the right. AR 176.  The impression of the radiologist was spondylosis at the C4-5 and C5-6 levels.  Id.  Knee x-rays ordered by Dr. Assam revealed degenerative changes in the right knee and osteoarthritis of the left knee. AR 173, 177. The x-ray of the right shoulder was unremarkable. AR 173. Dr. Assam's diagnosis was degenerative joint disease, elevated sed rate, and migratory joint problems. Id. She advised Plaintiff should not stand for more than ½ hour to 45 minutes. "Lifting and carrying would be limited, especially since she is so deconditioned from not working. I would not recommend that she stoop, climb, kneel. Repetitive handling objects will probably exacerbate the shoulder strain.  Seeing, hearing, speaking, traveling are not an issue.  Exposure to dust and temperature may have some effect on her asthma and arthritic changes.  Limitations as far as an individual's concentration, memory attention span, ability to stay on task and interact with others appear appropriate at this time." AR 175. Dr. Assam predicted that Plaintiff's prognosis to return to her previous work as a cook and waitress was poor. Id.

7


A residual functional capacity assessment form was completed by a non-treating, non-examining DDS physician (his or her signature is illegible on the form, but there is a stamp on AR 142 which indicates the DDS physician was Frederick Entwistle) on June 24, 2003. AR 135-142. The physician assigned migratory arthritis as the primary diagnosis and mild lumbar spinal stenosis as the secondary diagnosis. AR 135. Obesity and Asthma were other relevant diagnoses. Id. Dr. Entwistle opined Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand six hours out of an eight hour day, sit six hours out of an eight hour day, and push/pull unlimited. As support for his conclusions, Dr. Entwistle noted Plaintiff "drives a car" and he also noted that the MRI which was conducted in March, 2000 showed mild stenosis at the L4-5 and no evidence of lumbar HNP. Dr. Entwistle's handwritten comments are mostly illegible, but it appears he also cited Plaintiff's ability to dry her hair and do crafts as supportive of his opinions regarding her work abilities. AR 137. It is unknown where he obtained that information or to what time period he referred. He assigned no manipulative or visual limitations, but did acknowledge that stress may well be a "significant factor" in her impairments and activity pattern. AR 140. Dr. Entwistle opined that Dr. Assam's standing limitation of ½ hour to 45 minutes did not seem consistent with mild to moderate arthritis and full range of motion in the hips and knees.

Another non-treating, non-examining physician (Dr. Hosen, a pediatrician (see stamp at AR 150)) completed a functional capacity assessment on January 14, 2004. AR 143-150. His primary diagnosis was migratory arthritis. His secondary diagnosis was "DDD."[5] Dr. Hosen opined Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand 6 hours in an 8 hour workday, sit 6 hours in an 8 hour workday, and push/pull unlimited. Dr. Hosen's explanation for why he concluded Plaintiff was capable of these limitations is mostly illegible, however he appeared to rely on Dr. Entwistle's opinion. AR 144-145, 149.

Mrs. Baker testified at the hearing. She explained that she has four children, only one of whom still lives at home. AR 356. She babysits her grandchildren about twice a month. Id. Her husband also has a pending disability claim. AR 356-57. She last worked in May, 1999. AR 363, At the time of the hearing, she was 5'2" and 250 pounds. AR 357. She considered her normal weight to be 160, but had gained weight over the last ten years. She explained " the more pain I

---

[5]It is unknown, and unexplained in the record what "DDD" means.

8

have, it just keeps getting–just keep getting bigger." AR 358. She attributed the weight gain to swelling, fluid and inactivity rather than over -eating. In fact, she claims she eats less when she is in pain. AR 358. Ms. Baker is right-handed. AR 400. She occasionally uses a cane and a walker, and uses a "grabber" to assist her because she has a hard time bending. AR 358-59. The cane and walker were each prescribed by physicians after Mrs. Baker injured her back, and she has continued to use them on an as-needed basis. She was not really sure whether the prescribing physicians intended for the cane and/or walker to be used on a long-term basis. AR 359.

Mrs. Baker is a high school graduate with no post-high school education. She has never been in the military. AR 362. She has no difficulty reading, the surgery she had on her right ring finger makes writing painful. AR 360-61. The surgery allowed her to straighten the finger, but she is now unable to make a fist without difficulty. AR 361-62. She manages the household finances. AR 362.

Mrs. Baker was   last employed as a cook in the deli at Randall's Grocery Store. She prepared salads and catering orders. AR 363. She was on her feet all day and was required to lift up to 50 pounds. AR 365. She does not have any supervisory skills. AR 365. She quit because she knew she couldn't do her job anymore. She was having to ask people to help her lift things. AR 363, 396. She took extra long breaks, and went home at night in so much pain that she would lay in bed and cry. AR 396. Before she finally quit, she was working two jobs. AR 396.   She did not make any unemployment or worker's compensation claims. Id. At the time of the hearing, she subsisted on child support payments and food stamps. AR 364.

Mrs. Baker explained she did not believe she could work because she experienced pain "all over," with the most severe pain in her neck, shoulders, back and knees. AR 366. She had a constant, nagging pain and weakness in her neck since approximately 1999 which is worsened by prolonged looking down. AR 367. On average, her neck pain (medicated) is a four out of ten, and at its worst her neck pain is an eight out of ten. AR 368. Driving also aggravates her neck pain. Id. Plaintiff also described constant stabbing pain, extending down her arm and into her right hand  for approximately four or five years. AR 369-370. Immediately after a cortisone injection, she rates the pain at a four out of ten, but after the injection wears off (about two months) , the pain level rises to an eight out of ten. AR 370. The shoulder pain is aggravated by reaching behind, overhead, and to the side, but to a much lesser extent by reaching forward. AR 371. Mrs. Baker does physical therapy

9

exercises to keep her shoulder functional. Dr. McKenzie (from the Orthopedic Clinic) did not recommend surgery for Mrs. Baker's shoulder problems. AR 372.

Mrs. Baker also described her bilateral knee pain and swelling, which she has been experiencing for approximately ten to fifteen years. AR 373. The right knee is worse than the left. Id. She ranked her knee pain at a two to four. AR 374. The pain increases to six or seven when she walks, and going down steps is the worst. AR 375. Mrs. Baker takes aspirin and Naprosyn for pain. R 376. She also takes Prevacid to counteract the stomach pain which is caused by Naprosyn. Id. Mrs. Baker also described a flu-like achy pain all over, which she attributes to her fibromyalgia or migratory arthritis AR 376-77. Dr. Drymalski (rheumatologist) diagnosed fibromyalgia, and Dr. Malters diagnosed migratory arthritis. AR 377.

Mrs. Baker also explained that Dr. Alvine diagnosed a herniated disc in her back at the L4 level, and although surgery was suggested, she could not follow through because she had three children to raise alone. AR 378. She explained that her back pain varies based on her activities and is somewhat unpredictable. AR 378-79.

Mrs. Baker sleeps approximately five hours per night. AR 380. She helps her daughter get ready for school, the rests before she cleans up the dishes and does some laundry. She used to have a clothes line, but she can no longer reach it because of her shoulder. AR 400. Now she hangs the clothes on hangers and hangs them around the house. Id. After those chores, she rests for about 30 minutes. AR 381. She prepares lunch, and watches television. She is able to dress herself with the exception of putting on her shoes and socks. AR 382. She needs help pulling on her socks and her pants. Id. Her husband also assists her in getting out of the shower, because the bar is on the right side and has difficulty with her right arm. AR 383. She takes the garbage out in the winter because the burn barrel is right outside the door, but in the summer the garbage pit is further out in the yard and she cannot carry it that far. Id. She is able to do the dishes and the laundry. She assists her husband and daughter with the grocery shopping, but she cannot do it alone. AR 384. She does craft work for twenty minutes or so at a time, three or four times per week. AR 385. She can drive for an hour at a time before taking a break. AR 386. She can lift a gallon of milk with her left hand, but not her right. AR 386. She can walk to the neighbor's house and back (½ mile each way) but afterwards her extremities are swollen and she must go lay down. AR 388. She estimated she can

10

stand for ½ hour at a time before she would need to take a break. Id. She estimated she can sit for 20 minutes to ½ hour. AR 389. Her most comfortable position is laying down. Id. She usually naps from about 2:00 until 4:30 or 5:00 p.m. AR 390. She cannot squat, crawl, kneel, or grasp with her right hand. AR 390-91. She explained that her hand swells up if she even plays solitaire on the computer for 15 or 20 minutes. AR 393.

She also explained she has difficulty dealing with men in social situations. AR 394. She avoids close contact with them with them if possible. Id. When the DDS arranged for her to be examined by a physician, she requested a woman physician because she did not want to be examined by an unfamiliar man. AR 397. She attributes these feelings to the fact that she was beaten by her first husband. AR 404. She explained that she feels depressed about not being able to work because of her physical problems, but she does not take any medication for her mental health issues. AR 395-96.

Mrs. Baker also explained that she discontinued  physical therapy on her shoulder because the medical provider denied further treatment  due to an outstanding bill. AR 398. She's tried various pain medications, but she believes they bother her kidneys. AR 399. She takes Darvocet when she cannot stand the pain. Id.

Finally, a vocational expert (William Tucker) testified a the hearing. The ALJ asked Mr. Tucker three hypothetical questions.  The first hypothetical assumed an individual with the same age, education and work experience as Mrs. Baker, and assumed Mrs. Baker's hearing testimony regarding her physical limitations was credible. AR 406. Mr. Tucker testified that such a person would not be capable of returning to Mrs. Baker's past relevant work. AR 406. He also explained such an individual would not be capable of performing any other work. Id.

The ALJ's second hypothetical  assumed a person with the same age, education and work experience as Mrs. Baker, but able to do light work within the following parameters:

- lift or carry 20 pounds occasionally, 10 pounds frequently,
- Stand and or walk with normal breaks for 6 hours out of an 8 hour work day,
- Sit with normal breaks for 2 hours out of an 8 hour work day,
- Occasional balancing, stooping, kneeling, crouching and crawling,
- No climbing ladders, ropes or scaffolding,

11

- Avoid even moderate exposure to environmental irritants such as fumes, dust, odors, gases and secondary to asthma or other allergy type related to conditions.

Mr. Tucker indicated that with these limitations, a person would not be able to perform Mrs. Baker's past relevant work. AR 407. She would, however be able to perform other light, unskilled jobs such as small products assembler, inspector, hand packager, and laundry folder.

The ALJ's third hypothetical assumed a person with the same age, education and work experience as Mrs. Baker, but able to do light work within the following parameters:

- lift or carry 20 pounds occasionally, 10 pounds frequently,
- Stand and or walk with normal breaks for 6 hours out of an 8 hour work day,
- Sit with normal breaks for 2 hours out of an 8 hour work day,
- Never engage in push/pull activities with the right upper or lower extremity,
- Able to climb stairs and ramps occasionally, balance occasionally,
- Never climb ladders, ropes or scaffolds,
- Crouch, and stoop occasionally,
- Never kneel or crawl,
- Reach above shoulder level with the right upper extremity occasionally,
- Never reach overhead,
- Frequent fine and gross manipulation of the right-dominant fingers,
- Avoid moderate exposure to fumes and industrial gasses.

Mr. Tucker indicated that with these limitations, Mrs. Baker would not be able to return to her past relevant work. AR 408. She would, however, be able to perform the duties of a small products assembler, hand packager, and marker/labeler, all of which were available in South Dakota. Mr. Tucker also stated that all the jobs he listed involved repetitive use of the hands, and would present a "problem vocationally" if Mrs. Baker had a limitation on repetitive use of her hands. AR 409. All the jobs also require the worker to work a normal workday without taking excessive breaks to lay down. AR 410. All of the listed jobs would also be occupied by men (AR 410) and some would be eliminated if Mrs. Baker were unable to use all of the fingers on her right hand. AR 411.

12

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) .  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted).  In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting  it. Woolf, 3 F.3d at 1213.    The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Id.  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

### B.    The Disability Determination and The Five Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

13

months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8ᵗʰ Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. Bartlett v. Heckler, 777 F.2d 1318, 1319 (8ᵗʰ Cir. 1985). The five steps are as follows:

**Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8ᵗʰ Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 at n.2 (8ᵗʰ Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to

14

meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

### C.     Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. Barret v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).

### D.     The ALJ's Decision

The ALJ issued an eleven page, single-spaced decision on April 7, 2005. The ALJ's decision discussed all five steps of the above five-step procedure.

At step one, the ALJ found Mrs. Baker had not engaged in any substantial gainful activity since her disability onset date of May 15, 1999. AR 21.

At step two, the ALJ found Plaintiff had the following "severe" impairments: fixed flexion deformity of the right ring finger (status post PIP joint release); impingement and partial rotator cuff tear (right shoulder); moderate spondylosis at C4-5 and C5-6; osteoarthritis of the left knee evidenced by moderate medial marginal spurring along the joint line and mild posterior patella spurring; degenerative changes of the right knee; degenerative disc disease at L4-5; history of polyarthralgias; and asthma.    AR 21. He found the following non-severe impairments: gastroesophageal reflux disease; depression/anxiety. AR 21.

At step three, the ALJ found none of Plaintiff's severe impairments met or equaled Listings in Appendix 1, Subpart P, Regulation No. 4. AR 21.

At step four, the ALJ evaluated Plaintiff's credibility and found the objective medical

15

evidence failed to establish her impairments rendered her as significantly limited as she claimed. AR 25. He believed she was credible to the extent her conditions were supported by the medical records, but "her assertion of disability is not credible." AR 25. He noted her visits to medical providers since her alleged onset date were "sporadic." AR 23. The ALJ also noted Plaintiff's "significant" activities of daily living, including watching TV and reading magazines. AR 25. He noted she could dress herself, although she needed assistance putting on her shoes and socks. Id. He also cited her ability to wash dishes, do laundry, and feed her pets. He cited her ability to do craft work 3 times a week (for 20 minutes at a time) as an example of "intensive" use of her hands. AR 25. The ALJ rejected the opinions of the two physicians who examined Plaintiff (Drs. Malters and Assam). The ALJ rejected Dr. Malters' opinion because Dr. Malters had not yet reviewed the x-rays she ordered before she wrote her report. AR 24. The ALJ also found Dr. Malters' April, 2003 report in which she stated Plaintiff could not do "physical" work inconsistent with her January, 2005 report in which she stated Plaintiff was also incapable of doing "sedentary" work. AR 24. The ALJ also found Dr. Malters' January, 2005 report internally inconsistent because it required Plaintiff to lie down for 8 hours per day, but also allowed her to sit, stand or walk for 1 hour per day. The ALJ rejected Dr. Assam's opinion in part because she appeared to take Plaintiff's "deconditioned state" into consideration and her restrictions appeared inconsistent with Plaintiff's activities of daily living. The ALJ instead adopted (partially) the opinions of non-treating, non-examining DDS physicians because, according to the ALJ, their opinions were more consistent with the record as a whole. AR 25. The ALJ also imposed restrictions of his own (sit 2 hours out of an 8 hour day rather than 6 hours as imposed by the DDS physicians); never push/pull with the right upper or lower extremity; frequent gross and fine manipulation with the right upper extremity but never use the right extremity for overhead reaching). AR 26.

The ALJ determined Mrs. Baker had the RFC to perform a significant range of light exertional work activity. AR 26. Specifically, the ALJ found Mrs. Baker cannot lift/carry more than 20 pounds occasionally, 10 pounds frequently, she can stand/walk for 6 hours in an 8 hour day, sit (with normal breaks) for 2 hours in an 8 hour day, and cannot push/pull with her right upper or lower extremity. She can climb ramps and stairs occasionally. She can never climb ladders, ropes or scaffolds; she can never kneel or crawl. She can occasionally balance, crouch and stoop. She can

16

occasionally reach to the shoulder level with the right upper extremity. She can frequently engage in fine and gross manipulation with the right upper extremity, but can never use the right upper extremity for overhead reaching. She must avoid even moderate exposure to environmental irritants such as dusts, fumes, gases, odors, etc. Given these limitations, the ALJ determined Mrs. Baker is incapable of returning to any of her past relevant work.

At step five, the ALJ found that given Mrs. Baker's residual functional capacity, she is capable of performing a significant range of light work. AR 27. He noted, however, that her ability to perform all or substantially all the requirements of light work is impeded by additional exertional and/or non-exertional limitations already described. Unskilled light jobs including small products assembler, inspector/hand packager and marker/labeler remained viable options for Plaintiff. AR 27. The ALJ determined, therefore, that Mrs. Baker is not "disabled."

E.      **The Parties' Positions**

Mrs. Baker raises three issues on appeal. She asserts: (1) The Commissioner failed to provide good reasons for rejecting the opinion of Mrs. Baker's treating physician (Dr. Malters) and the consulting physician (Dr. Assam); (2) The Commissioner failed to properly evaluate Mrs. Baker's subjective pain complaints and other symptoms; and (3) The Commissioner failed to consider the combined effects of all Mrs. Baker's severe impairments when determining her residual functional capacity. The Commissioner asserts the ALJ's decision is supported by substantial evidence and free of legal error, and should be affirmed.

1.      **Evaluation of the Medical Evidence**

Mrs. Baker asserts Dr. Malters should be viewed as a treating physician, and her opinions should therefore be given controlling weight if they are well supported by medically accepted clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. 404.1527(d) provides:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>     (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>     (2) Treatment relationship. Generally, we give more weight to opinions from

17

your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of treatment relationship and frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****. When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Support ability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of

18

which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

The Commissioner asserts Dr. Malters is not a treating physician, and her opinion should not be given controlling weight even if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. There is no evidence Mrs. Baker had ever seen Dr. Malters before the April 1, 2003 disability examination and resulting opinion. "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence . . ." Balstad v. Barnhart, 2006 WL 3106578 (N.D. Ia. 2006). Thereafter, however, Dr. Malters saw Mrs. Baker on at least a couple of occasions for treatment purposes regarding Mrs. Baker's ongoing pain complaints, and to prescribe medication (March 22, 2004 and June 21, 2004) before Dr. Malters completed a "Medical Source Statement" regarding Mrs. Baker's physical abilities on January 7, 2005. By the time Dr. Malters completed the January 7, 2005 evaluation, therefore, she *could* be considered a "treating" physician–although it is a very close question. See McDaniel v. Barnhart, 375 F.Supp.2d 975 (E.D. Cal. 2004) (ALJ erred in not giving greater weight to treating physician who only saw Plaintiff four times, the last time being over one year prior to rendering opinion, and the physician did not do any new diagnostic studies before giving opinion). The question becomes, therefore, whether the ALJ sufficiently articulated reasons for failing to give her opinions controlling weight.

The ALJ rejected Dr. Malters' opinion because she did not explain what she meant when she stated in her 2003 report that Mrs. Baker "meets the criteria for full disability" and that she was "unable to do physical work." The ALJ also found Dr. Malters' statements in her 2005 report inconsistent because she stated Mrs. Baker must lie down for 8 hours per day, but that she could also do other activities (i.e. sit/stand) for certain periods of time during the same 8 hour day. The ALJ found the restriction of no "physical work" (from the 2003 report) inconsistent with the restriction of less than sedentary work (from the 2005 report). He believed Dr. Malters did not understand the form she filled out. Finally, the ALJ stated "her opinion is not supported by the medical records,

19

objective evidence, or consistent with the claimant's activities of daily living. Therefore, the undersigned assigned little weight to the Dr. Malters opinion." AR 25.

The ALJ's assignment of "little weight" to Dr. Malters' opinion is not supported by substantial evidence for a couple of reasons. A finding that a treating source's medical opinion is not well supported by medically accepted clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence means only that the opinion is not entitled to controlling weight, –not that it should be rejected altogether. See SSR 96-2p. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight." Robinson v. Barnhart, 248 F.Supp.2d 607, 625 (S.D. Tex. 2003). First, if the ALJ had questions about the statements in Dr. Malters' reports, the ALJ had a duty to clarify the record. Social Security proceedings are non-adversarial. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). The ALJ, therefore, is responsible to develop the record fairly and fully independent of the claimant's burden to prove her case. Id. This is true even if the claimant is represented by counsel. Id. If a crucial issue is underdeveloped, the ALJ should seek additional clarifying statements from the treating physician. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). If several examining physicians have provided detailed clinical data and observations about the claimant's limitations, then further development of the record may not be necessary. That was the case in Stormo but not in this case. As was noted by the ALJ himself, the records from Mrs. Baker's treating physicians were relatively sparse. (AR 23, "the Claimant's appointments with her doctor since her alleged onset date were sporadic." "The Claimant did not see a doctor again until July 2003, which is over three years after her previous appointment." AR 24 "Interestingly, the claimant had not been to any doctor since march 2000 prior to this appointment."). Until the request was made of Dr. Malters in 2003, none of Mrs. Baker's physicians had been asked to comment upon her physical ability to return to work. [6] The sparseness of records from Mrs. Baker's other treating

---

[6]Mrs. Baker noted during the hearing that her failure to seek medical treatment was due at least in part to her inability to pay. AR 398. The medical records verify her claim. See AR 294 (note in Dr. Brian Tjarks' records which states, "NO DRUGS or APPTS UNTIL BILL IS PAID." This testimony was uncontradicted, but the ALJ failed to recognize it as justification for Claimant's "sporadic" medical care. A claimant may not be penalized for failing to seek treatment she cannot afford. "It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help

physicians made clarification of Dr. Malters' statements even more important. Where there are gaps or deficiencies in the record regarding a treating physician's diagnosis which can be addressed by seeking additional information, the ALJ is obligated develop the record by seeking additional information or explanations from the treating physician before rejecting the physician's opinion or diagnosis. Otherwise, the ALJ's decision is not supported by substantial evidence. Robinson v. Barnhart, 248 F.Supp.2d 607, 625-26 (S.D. Tex. 2003). See also SSR 96-2: "In some instances, additional development required by a case–for example to obtain more evidence or to clarify reported clinical signs or laboratory findings–may provide the requisite support for a treating sources's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between the treating source's medical opinion and the other substantial evidence in the record." The Regulations also guide the ALJ's duty to re-contact the treating physician for clarification. 20 C.F.R. § 404.1512(e)(1) provides that if the information received from a treating physician is inadequate "we will first recontact your treating physician . . or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." Dr. Malters' April, 2003 report (which the ALJ found unclear) invited the recipient to contact her with any questions and listed a telephone number. The ALJ also perceived inconsistencies between Dr. Malters' 2003 report and her January, 2005 report, and ambiguities within her 2005 report. There is no indication in the record, however, that Dr. Malters was ever contacted for clarification.

The other reasons proffered by the ALJ for rejecting Dr. Malters' opinion are likewise not supported by substantial evidence. The ALJ found Dr. Malters' restrictions were "not supported by the medical records, objective evidence, or consistent with the claimant's activities of daily living."

him." Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986). See also SSR 82-59 (justifiable cause for failure to follow prescribed medical treatment includes inability to pay); Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984) ("[W]e believe that a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be, and in this case is, an independent basis for finding justifiable cause for noncompliance.").

The ALJ did not specify which medical records or objective evidence to which he referred. However, Dr. Greg Alvine's last note indicated that if conservative measures failed, he recommended surgical fusion with an interbody cage. Plaintiff's MRI revealed a focal central disc protrusion at the L4-5 and mild stenosis, with anterior osteophytes, with disc space collapse at L4-5. Plaintiff's shoulder (bicipital tendinitis) requires ongoing injections, and her right ring finger does not have good active flexion. X-rays of Plaintiff's cervical spine showed osteophytes and spondylosis, and her knee x-rays also revealed arthritis of the left knee. Plaintiff's activities of daily living consisted of preparing meals, washing dishes, feeding her pets, taking out the trash (which was a burn barrel right outside the back door) doing crafts twenty minutes per day, three times per week, and taking daily two hour naps. The "appropriate inquiry is whether substantial evidence in the record as a whole supports the ALJ's findings that a claimant can perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Shaw v. Apfel, 220 F.3d 937, 939 (8th Cir. 2000). Plaintiff's testimony about her daily activities led to exactly the opposite conclusion.    "An SSI Claimant need not prove that she is bedridden or completely helpless to be found disabled and the fact that claimant cooks and cleans for herself, shops for groceries, does laundry, visits friends, attends church, and goes fishing does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Dr. Susan Assam saw Mrs. Baker only once for a consultative exam on June 11, 2003 (between Dr. Malters' first and second evaluations). Dr. Assam had at her disposal Dr. Malters' first examination results and diagnostic evaluations, as well as Mrs. Baker's earlier medical records which were provided by DDS. Nevertheless, the ALJ likewise rejected Dr. Assam's opinion "because she appears to be taking into account the Claimant's deconditioned state and because some of her limitations are not consistent with the claimant's activities of daily living." The only reference Dr. Assam made to Mrs. Baker's "deconditioned state" however, was that lifting and carrying would be limited, "especially since she is so deconditioned from not working." Dr. Assam made no specific restrictions on sitting or reaching or upon Mrs. Baker's fine and gross hand manipulation abilities. One of the activities of daily living the ALJ found inconsistent with Dr. Assam's

22

restrictions, however, was Mrs. Baker's "intensive" use of her hands while doing craft work for 20 minutes per day. As explained above, doing craft work for 20 minutes per day is not substantial evidence that Mrs. Baker is able to perform substantial gainful work. Dr. Assam did indicate that repetitive handling of objects would exacerbate Mrs. Baker's shoulder injury, but Dr. Assam did not attribute the shoulder injury to Mrs. Baker's "deconditioned state." Likewise, Dr. Assam limited Mrs. Baker's standing to 45 minutes, but attributed this limitation to arthritic changes in Mrs. Baker's legs, not her "deconditioned state." For these reasons, the ALJ's rejection of Dr. Assam's opinion is not supported by substantial evidence.

The ALJ rejected the opinions of the only two physicians who actually examined Mrs. Baker in favor of two physicians (one was a pediatrician) who merely reviewed Mrs. Baker's records. "These assessments alone cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). More weight should generally be given to the opinions of physicians who examine plaintiff than to the opinions of non-examining state agency review physicians, who review written medical records but do not conduct physical examinations themselves. See 20 C.F.R. § 404.1527(d)(1). See also Bergfeld v. Barnhart, 361 F.Supp.2d 1102, 1111-1112 (D. Az. 2005) (even if treating physician's opinion is controverted by non-treating physician, ALJ must still make findings setting forth specific legitimate reasons setting forth substantial reasons for rejecting it, and conclusory statements such as "not consistent with the medical records" do not constitute a sufficiently clear and specific reason to reject the opinion of a treating physician). Finally, the support provided by the non-treating, non-examining physicians for their opinions was insufficient to constitute substantial evidence. See 20 C.F.R. 404.1527(d)(3). "Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions . . ." As earlier noted, most of Dr. Entwistle's supporting comments are illegible. He does note, however that Mrs. Baker does "hand crafts" and "drives a car." For the reasons already explained, these activities are insufficient to support a finding that Mrs. Baker is capable of substantial, gainful work activity. Also, it appears Dr. Entwistle cited outdated or selective objective medical exams which supported his opinion (a right shoulder arthrogram which was normal in 1992, for example (AR 156)and an x-ray from April 1,

2003 of the right shoulder that was negative (AR 173) but ignored those which detracted from it a (right shoulder MRI from 2003 showing partial thickness tearing AR 212). See also AR 176-77 (X-rays of cervical spine and left knee, showing spondylosis and osteoarthritis, which were performed on the same date as the right shoulder x-ray above but not mentioned by Dr. Entwistle). The other non-treating, non-examining physician (Dr. Hosen, the pediatrician)[7] provided even less supporting explanations and appeared to rely on Dr. Entwistle's justification for rejecting the treating physician's physical restrictions. AR 149. For all of these reasons, the ALJ's decision to adopt the non-treating, non-examining physicians' opinions instead of the examining physicians (Dr. Malters and Dr. Assam) is not supported by substantial evidence.

### 2.    Evaluation of Mrs. Baker's Credibility

At page 4 of his 11 page decision (AR 22) the ALJ acknowledged (by listing) the factors to be considered when evaluating the claimant's credibility. The ALJ's opinion then proceeded in a narrative fashion to summarize Mrs. Baker's medical history and treatment. On the seventh page of his opinion, The ALJ stated "the claimant is credible to the extent her conditions are supported by her medical records. However, her assertion of disability is not credible." AR 25. "Where adequately explained and supported, credibility findings are for the ALJ to make." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). In order to properly assess a claimant's credibility, the ALJ must consider not only the objective medical evidence, but all the evidence including the Claimant's prior work history, observations by third parties and doctors regarding daily activities, the duration, frequency and intensity of the pain, precipitating and aggravating factors, and the dosage, effectiveness and side effects of medication and functional restrictions. Id. See also Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3). The ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting the claimants's subjective complaints. Lowe, 226 F.3d at 972.

---

[7]20 C.F.R. 404.1527(d)(5) requires the ALJ to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. Dr. Malters is an internal medicine specialist. AR 171. Dr. Assam is a physical medicine and rehabilitation specialist. AR 174. It is unexplained in the record why DDS retained the services of a pediatrician to render an opinion in an adult Social Security Disability case.

When a Plaintiff claims the ALJ failed to properly consider her subjective pain complaints, the duty of the Court is to ascertain whether the ALJ considered *all* of the evidence relevant to the Plaintiff's complaints of pain under the <u>Polaski</u> standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount her testimony as not credible. <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738-39 (8th Cir. 2004) (emphasis added). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all the evidence. <u>Id.</u>

The ALJ recited the <u>Polaski</u> factors on page 4 of his written opinion (AR 22). His rationale for rejecting Plaintiff's subjective pain complaints consists of a single statement "the undersigned believes the claimant is credible to the extent her conditions are supported by her medical records. However, her assertion of disability is not credible." The task for the Court, therefore, is to determine whether the ALJ properly considered all the record evidence when he determined "her assertion of disability is not credible"

The ALJ cited some of Plaintiffs claims which he found inconsistent with her "significant" activities of daily living. For the reasons already explained, the ALJ's finding that Plaintiff's pain complaints were inconsistent with her ability to prepare meals, watch television, and do crafts 20 minutes per day three times a week is not supported by substantial evidence. The ALJ also cited as an example of Plaintiff's lack of credibility her assertion that she could not write because of her finger injury. AR 25. This is simply wrong. Mrs. Baker explained that after surgery to straighten the finger, she gained some use, but that now "it's locking straighter again." AR 362. She also said that writing was painful. AR 360. In response to the ALJ's question, the Plaintiff said "yes, oh yes I can write." AR 362. The ALJ cited Mrs. Baker's statement that medication and injections reduced her pain levels, but he attached little importance to her medicated pain levels (four out of ten).

Finally, the ALJ commented on Mrs. Baker's claimed fatigue. He noted, "the undersigned has reviewed the record and sees neither objective evidence indicating a need for these naps nor any complaints about unusual fatigue." The ALJ failed to acknowledge the remarks by Dr. Assam and Dr. Malters, however, about Mrs. Baker's fatigue complaints, or about the affidavit from Mrs. Baker's former employer (Mark McMahon) which stated Mrs. Baker had always been a good employee but "did not have the energy or endurance that she had in the past or that I would expect

25

from someone her age. It seemed that she became a "grandma" before her time." AR 119. Instead, the ALJ merely stated Mrs. Baker was credible to the extent her conditions were supported by the medical records. Polaski suggests, however, that the absence of objective medical evidence is only one factor to consider, and the ALJ must look beyond the objective medical evidence when evaluating subjective pain complaints. Masterson, 363 F.3d at 738. See also 20 C.F.R. § 404.1529.

A careful review of the record suggests the ALJ centered upon the absence of objective medical evidence without really considering whether the other Polaski factors supported the level of Plaintiff's pain complaints. The credibility factors he cited referenced medical records (or the lack thereof) which, in part, refuted Plaintiff's assertion of disabling pain. But the ALJ must demonstrate he considered, not merely cited the Polaski factors, and considered the evidence as a whole.

The ALJ relied on selective records and only a few of the appropriate factors to determine the reliability of Plaintiff's pain complaints. When the entirety of the record and all the Polaski factors are considered, the ALJ's evaluation of the credibility Plaintiff's pain complaints is not supported by substantial evidence.

### 3.   Combined Effects of Mrs. Baker's Severe Impairments to Determine Residual Functional Capacity

At step two, the ALJ found Mrs. Baker had the following "severe" impairments:[8] fixed flexion deformity of the right ring finger (status post PIP joint release); impingement and partial rotator cuff tear (right shoulder); moderate spondylosis at C4-5 and C5-6; osteoarthritis of the left knee evidenced by moderate medial marginal spurring along the joint line and mild posterior patella spurring; degenerative changes of the right knee; degenerative disc disease at L4-5; history of polyarthralgias; and asthma. At step four, he found she had the residual functional capacity to perform a significant range of light work.

Plaintiff asserts the ALJ's formulation of a residual functional capacity which opined she could stand or walk 6 hours out of an 8 hour work day is inconsistent with his own finding that she is unable to return to her past relevant work. She further asserts the ALJ's adoption of the consulting physicians' RFC is inconsistent with or completely ignores many of the severe impairments

---

[8]By acknowledging the impairments are "severe" the ALJ recognized they significantly limit Mrs. Baker's physical or mental ability to do basic work activities. See 20 C.F.R. 404.1520(c); Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998).

identified in the ALJ's own findings (osteoarthritis, right shoulder impingement and rotator cuff tear, moderate spondylothesis, degenerative changes in the right knee, degenerative disc disease, polyarthralgias and asthma). Plaintiff also asserts the ALJ failed to recognize or discuss the effect of Plaintiff's obesity on her RFC. Finally, she asserts all the jobs identified by the ALJ require either constant or frequent use of her upper extremities, which is inconsistent with both her right finger impairment and her right shoulder impairment.

The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000). However, "[t]his does not mean that the hypothetical must include all of the impairments a claimant alleges. It is required to include only those impairments that the ALJ finds actually exist, and not impairments the ALJ rejects–assuming of course, that the ALJ's findings are supported by substantial evidence." Onstad v. Shalala, 999 F.2d 1232, 1234-35 (8th Cir. 1993).   The ALJ's hypothetical question to the vocational expert must include all the appropriate impairments, and testimony by a vocational expert constitutes  substantial evidence only when based on a proper hypothetical question. Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir. 2004). Jobs which are identified by the vocational expert, therefore, which include unrealistic physical demands included in a flawed hypothetical by the ALJ cannot, therefore, constitute substantial, gainful employment.

The ALJ took specific note of Mrs. Baker's height and weight during the administrative hearing. AR 357-358. At the time of the hearing, she was 5'2" and 250 pounds. Both Dr. Assam and Dr. Malters noted Mrs. Baker was "overweight" and/or that she had weight gain. AR 169-171, 174-75. They also both noted problems with her knees and arthritic changes. Mrs. Baker's attorney brought her obesity to the ALJ's attention before the administrative hearing. AR 56. Nonetheless, the ALJ failed to consider the effect of Plaintiff's obesity upon her RFC. Although obesity is no longer a listed impairment[9] the Social Security Administration has emphasized that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." The ruling instructs that the effects of obesity should be considered at all steps of the evaluation process, including the RFC formulation. SSR 02-01p: Introduction.

---

[9]Obesity was withdrawn from the listings in October, 1999. See SSR 02-01p.

Paragraph 8 of SSR 02-01p specifically addresses obesity in the RFC formulation. It explains that obesity may cause the limitation of function in sitting, standing, walking, lifting, carrying, pushing, and pulling. The presence of fatty tissue in the hands and fingers should also be considered in jobs which require fine manipulation. People with obesity also often have sleep apnea, which causes drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning. Id. The ruling also explains that the adjudicator should consider the effect that obesity has upon the individual's ability to perform routine necessary physical activity within the work environment on a regular and continuing basis. "In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity." Id. The SSR specifically mentions obesity combined with arthritic changes: "The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight bearing joint may have more pain and limitation than might be expected from the arthritis alone." As such, the effect of Plaintiff's obesity should have been considered (at least) upon her degenerative disc disease, polyarthralgia, and knee problems in determining her RFC.

Finally, the ALJ's RFC formulation omitted the physical limitations caused by at least one of the "severe" impairments which the ALJ acknowledged Mrs. Baker has. The ALJ recognized as a "severe" impairment Mrs. Baker's fixed flexion deformity of the right ring finger. The record evidence is undisputed that Mrs. Baker suffers pain and immobility of the right ring finger as a result of the impairment, and that Dr. Malters and Dr. Assam both restricted her to little or no repetitive handling and fingering. By recognizing it as a "severe" impairment, the ALJ acknowledged Mrs. Baker's right ring finger fixed flexion deformity "significantly limits" her physical ability to do basic work activity, yet the ALJ found Mrs. Baker capable of frequent fine and gross manipulation with the right upper extremity, and of performing three jobs which require frequent or continuous use of the upper extremity or constant reaching and handling. See DOT Codes for small products assembler, inspector/hand packager, and marker/labeler (attached). Because the RFC formulation was flawed, therefore, the vocational expert's identification of suitable jobs is not supported by substantial evidence.

28

## CONCLUSION

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. The Plaintiff requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id., Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because what limited record evidence there is should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate. It is respectfully RECOMMENDED to the District Court, therefore, that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated this 6 _day of June, 2007.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:
JOSEPH HAAS, Clerk

By _____, Deputy

Westlaw.

DICOT **739.687-030**  ASSEMBLER, SMALL PRODUCTS II

DICTIONARY OF OCCUPATIONAL TITLES
Fourth Edition, Revised 1991

Occupational Group Arrangement

7  Benchwork Occupations

  73  Occupations in Fabrication and Repair of Products Made from Assorted
Materials

    739  Occupations in Fabrication and Repair of Products Made from Assorted
Materials, N.E.C.

**739.687-030  ASSEMBLER, SMALL PRODUCTS II**

Industry Designation:  Any Industry

  Performs any combination of following duties to assemble parts of various
materials, such as plastic, wood, metal, rubber, or paperboard, to produce small
products, such as roller skates, toys, shoe lasts, musical instrument parts, or
loudspeakers: Positions parts in specified relationship to each other, using hand,
tweezers, or tongs. Bolts, screws, clips, cements, or otherwise fastens parts
together by hand, using handtools, portable powered tools, or bench machines.
Performs fastening, force fitting, or light cutting operations, using machines
such as arbor presses, punch presses, taps, spot-welding or riveters.

GUIDE FOR OCCUPATIONAL EXPLORATION:  06.04.23

STRENGTH:  Light Work - Exerting up to 20 pounds of force occasionally
(Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10
pounds of force frequently (Frequently: activity or condition exists from 1/3 to
2/3 of the time) and/or a negligible amount of force constantly (Constantly:
activity or condition exists 2/3 or more of the time) to move objects.  Physical
demand requirements are in excess of those for Sedentary Work.  Even though the
weight lifted may be only a negligible amount, a job should be rated Light Work:
(1) when it requires walking or standing to a significant degree; or (2) when it
requires sitting most of the time but entails pushing and/or pulling of arm or leg
controls; and/or (3) when the job requires working at a production rate pace
entailing the constant pushing and/or pulling of materials even though the weight
of those materials is negligible.

    Reasoning:  Level 2 - Apply commonsense understanding to carry out detailed but
uninvolved written or oral instructions.  Deal with problems involving a few
concrete variables in or from standardized situations.

    Math:      Level 1 - Add and subtract two-digit numbers.  Multiply and divide
10's and 100's by 2, 3, 4, 5.  Perform the four basic arithmetic operations with
coins as part of a dollar.  Perform operations with units such as cup, pint, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DICOT **739.687-030**  ASSEMBLER, SMALL PRODUCTS II

quart; inch, foot, and yard; and ounce and pound.

     Language:   Level 1 - READING: Recognize meaning of 2,500 (two- or
three-syllable) words.  Read at rate of 95-120 words per minute.  Compare
similarities and differences between words and between series of numbers.

     WRITING: Print simple sentences containing subject, verb, and object, and series
of numbers, names, and addresses.

     SPEAKING: Speak simple sentences, using normal word order, and present and past
tenses.

SPECIFIC VOCATIONAL PREPARATION:  Level 2 - Anything beyond short demonstration up
to and including 1 month
     Data:     6 - Comparing
     N - Not Significant
     People:   8 - Taking Instructions-Helping
     N - Not Significant
     Things:   7 - Handling
     S - Significant
     Field 1:  102 - Structural Fabricating-Installing-Repairing
     Field 2:  121 - Mechanical Fabricating-Installing-Repairing
     Field 1:  610 - MISCELLANEOUS FABRICATED PRODUCTS
     General Learning Ability:   Level 4 - Lowest 1/3 Excluding Bottom 10%
     Low Degree of Aptitude Ability
     Verbal Aptitude:            Level 4 - Lowest 1/3 Excluding Bottom 10%
     Low Degree of Aptitude Ability
     Numerical Aptitude:         Level 4 - Lowest 1/3 Excluding Bottom 10%
     Low Degree of Aptitude Ability
     Spacial Aptitude:           Level 4 - Lowest 1/3 Excluding Bottom 10%
     Low Degree of Aptitude Ability
     Form Perception:            Level 4 - Lowest 1/3 Excluding Bottom 10%
     Low Degree of Aptitude Ability
     Clerical Perception:        Level 5 - Bottom 10% of the Population
     Markedly Low Aptitude Ability
     Motor Coordination:         Level 3 - Middle 1/3 of the Population
     Medium Degree of Aptitude Ability
     Finger Dexterity:           Level 3 - Middle 1/3 of the Population
     Medium Degree of Aptitude Ability
     Manual Dexterity:           Level 3 - Middle 1/3 of the Population
     Medium Degree of Aptitude Ability
     Eye-Hand-Foot Coordination: Level 5 - Bottom 10% of the Population
     Markedly Low Aptitude Ability
     Color Discrimination:       Level 5 - Bottom 10% of the Population
     Markedly Low Aptitude Ability
     R:  Performing REPETITIVE or short-cycle work
     T:  Attaining precise set limits, TOLERANCES, and standards
     Climbing:        Not Present - Activity or condition does not exist
     Balancing:       Not Present - Activity or condition does not exist
     Stooping:        Not Present - Activity or condition does not exist
     Kneeling:        Not Present - Activity or condition does not exist
     Crouching:       Not Present - Activity or condition does not exist
     Crawling:        Not Present - Activity or condition does not exist
          © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DICOT 739.687-030  ASSEMBLER, SMALL PRODUCTS II

```
Reaching:           Constantly    - Exists 2/3 or more of the time
Handling:           Constantly    - Exists 2/3 or more of the time
Fingering:          Constantly    - Exists 2/3 or more of the time
Feeling:            Not Present   - Activity or condition does not exist
Talking:            Not Present   - Activity or condition does not exist
Hearing:            Not Present   - Activity or condition does not exist
Tasting/Smelling:   Not Present   - Activity or condition does not exist
Near Acuity:        Constantly    - Exists 2/3 or more of the time
Far Acuity:         Not Present   - Activity or condition does not exist
Depth Perception:   Constantly    - Exists 2/3 or more of the time
Accommodation:      Constantly    - Exists 2/3 or more of the time
Color Vision:       Not Present   - Activity or condition does not exist
Field of Vision:    Not Present   - Activity or condition does not exist
Exposure to Weather: Not Present  - Activity or condition does not exist
Extreme Cold:       Not Present   - Activity or condition does not exist
Extreme Heat:       Not Present   - Activity or condition does not exist
Wet and/or Humid:   Not Present   - Activity or condition does not exist
Noise Level:        Level 3       - Moderate
Vibration:          Not Present   - Activity or condition does not exist
Atmospheric Cond.:  Not Present   - Activity or condition does not exist
Moving Mech. Parts: Not Present   - Activity or condition does not exist
Electric Shock:     Not Present   - Activity or condition does not exist
High Exposed Places: Not Present  - Activity or condition does not exist
Radiation:          Not Present   - Activity or condition does not exist
Explosives:         Not Present   - Activity or condition does not exist
Toxic Caustic Chem.: Not Present  - Activity or condition does not exist
Other Env. Cond.:   Not Present   - Activity or condition does not exist
```

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

DICOT **559.687-074**  INSPECTOR AND HAND PACKAGER

DICTIONARY OF OCCUPATIONAL TITLES
Fourth Edition, Revised 1991

Occupational Group Arrangement

5  Processing Occupations

  55  Occupations in Processing of Chemicals, Plastics, Synthetics, Rubber, Paint,
and Related Products

    559  Occupations in Processing of Chemicals, Plastics, Synthetics, Rubber,
Paint, and Related Products, N.E.C.

**559.687-074**  INSPECTOR AND HAND PACKAGER

Industry Designation:  Fabricated Plastic Products Industry

  Inspects molded plastic products, such as bottle caps or tops, for defects, and
packs inspected products into shipping cartons: Visually examines molded products
for defects, such as scratches, discoloration, and flash, and discards defective
products. Packs inspected product in cartons according to customer specifications,
and carries cartons to storage area. May attach metal bands to bottle tops prior
to packing to form necks for bottles and measure necks to ensure specified length,
using gauge.

GUIDE FOR OCCUPATIONAL EXPLORATION:  06.03.02

STRENGTH:  Light Work - Exerting up to 20 pounds of force occasionally
(Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10
pounds of force frequently (Frequently: activity or condition exists from 1/3 to
2/3 of the time) and/or a negligible amount of force constantly (Constantly:
activity or condition exists 2/3 or more of the time) to move objects.  Physical
demand requirements are in excess of those for Sedentary Work.  Even though the
weight lifted may be only a negligible amount, a job should be rated Light Work:
(1) when it requires walking or standing to a significant degree; or (2) when it
requires sitting most of the time but entails pushing and/or pulling of arm or leg
controls; and/or (3) when the job requires working at a production rate pace
entailing the constant pushing and/or pulling of materials even though the weight
of those materials is negligible.

    Reasoning:  Level 2 - Apply commonsense understanding to carry out detailed but
uninvolved written or oral instructions.  Deal with problems involving a few
concrete variables in or from standardized situations.

    Math:      Level 1 - Add and subtract two-digit numbers.  Multiply and divide
10's and 100's by 2, 3, 4, 5.  Perform the four basic arithmetic operations with
coins as part of a dollar.  Perform operations with units such as cup, pint, and
quart; inch, foot, and yard; and ounce and pound.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DICOT **559.687-074**  INSPECTOR AND HAND PACKAGER

Language:   Level 2 - READING: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute.  Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation.  Read instructions for assembling model cars and airplanes.

WRITING: Write compound and complex sentences, using cursive style, proper end puncuation, and employing adjectives and adverbs.

SPEAKING: Speak clearly and distinctly with appropriate pauses and emphasis, correct puncuation, variations in word order, using present, perfect, and future tenses.

SPECIFIC VOCATIONAL PREPARATION: Level 2 - Anything beyond short demonstration up to and including 1 month
        Data:      6 - Comparing
        S - Significant
        People:    8 - Taking Instructions-Helping
        N - Not Significant
        Things:    7 - Handling
        S - Significant
        Field 1:  212 - Inspecting-Measuring-Testing
        Field 2:  041 - Filling-Packing-Wrapping
        Field 1:  510 - RUBBER AND MISCELLANEOUS PLASTIC PRODUCTS
        General Learning Ability:    Level 4 - Lowest 1/3 Excluding Bottom 10%
        Low Degree of Aptitude Ability
        Verbal Aptitude:             Level 4 - Lowest 1/3 Excluding Bottom 10%
        Low Degree of Aptitude Ability
        Numerical Aptitude:          Level 4 - Lowest 1/3 Excluding Bottom 10%
        Low Degree of Aptitude Ability
        Spacial Aptitude:            Level 4 - Lowest 1/3 Excluding Bottom 10%
        Low Degree of Aptitude Ability
        Form Perception:             Level 3 - Middle 1/3 of the Population
        Medium Degree of Aptitude Ability
        Clerical Perception:         Level 4 - Lowest 1/3 Excluding Bottom 10%
        Low Degree of Aptitude Ability
        Motor Coordination:          Level 3 - Middle 1/3 of the Population
        Medium Degree of Aptitude Ability
        Finger Dexterity:            Level 3 - Middle 1/3 of the Population
        Medium Degree of Aptitude Ability
        Manual Dexterity:            Level 3 - Middle 1/3 of the Population
        Medium Degree of Aptitude Ability
        Eye-Hand-Foot Coordination:  Level 5 - Bottom 10% of the Population
        Markedly Low Aptitude Ability
        Color Discrimination:        Level 3 - Middle 1/3 of the Population
        Medium Degree of Aptitude Ability
        R:  Performing REPETITIVE or short-cycle work
        Climbing:         Not Present  - Activity or condition does not exist
        Balancing:        Not Present  - Activity or condition does not exist
        Stooping:         Occasionally - Exists up to 1/3 of the time
        Kneeling:         Not Present  - Activity or condition does not exist
        Crouching:        Not Present  - Activity or condition does not exist
        Crawling:         Not Present  - Activity or condition does not exist
        Reaching:         Frequently   - Exists from 1/3 to 2/3 of the time

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DICOT 559.687-074   INSPECTOR AND HAND PACKAGER

```
Handling:              Frequently    - Exists from 1/3 to 2/3 of the time
Fingering:             Frequently    - Exists from 1/3 to 2/3 of the time
Feeling:               Not Present   - Activity or condition does not exist
Talking:               Not Present   - Activity or condition does not exist
Hearing:               Not Present   - Activity or condition does not exist
Tasting/Smelling:      Not Present   - Activity or condition does not exist
Near Acuity:           Frequently    - Exists from 1/3 to 2/3 of the time
Far Acuity:            Not Present   - Activity or condition does not exist
Depth Perception:      Not Present   - Activity or condition does not exist
Accommodation:         Frequently    - Exists from 1/3 to 2/3 of the time
Color Vision:          Frequently    - Exists from 1/3 to 2/3 of the time
Field of Vision:       Not Present   - Activity or condition does not exist
Exposure to Weather:   Not Present   - Activity or condition does not exist
Extreme Cold:          Not Present   - Activity or condition does not exist
Extreme Heat:          Not Present   - Activity or condition does not exist
Wet and/or Humid:      Not Present   - Activity or condition does not exist
Noise Level:           Level 4       - Loud
Vibration:             Not Present   - Activity or condition does not exist
Atmospheric Cond.:     Not Present   - Activity or condition does not exist
Moving Mech. Parts:    Not Present   - Activity or condition does not exist
Electric Shock:        Not Present   - Activity or condition does not exist
High Exposed Places:   Not Present   - Activity or condition does not exist
Radiation:             Not Present   - Activity or condition does not exist
Explosives:            Not Present   - Activity or condition does not exist
Toxic Caustic Chem.:   Not Present   - Activity or condition does not exist
Other Env. Cond.:      Not Present   - Activity or condition does not exist
```

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

DICOT **920.687-126**  MARKER II

DICTIONARY OF OCCUPATIONAL TITLES
Fourth Edition, Revised 1991

Occupational Group Arrangement

9  Miscellaneous Occupations

  92  Packaging and Materials Handling Occupations

    920  Packaging Occupations

**920.687-126  MARKER II**

Industry Designation:  Any Industry

Alternate Titles:  Labeler; Stamper

  Marks or affixes trademarks or other identifying information, such as size,
color, grade, or process code, on merchandise, material, or product, using one or
more methods, such as metal punch and hammer, crayon, rubber stamp and ink,
electric pencil, branding iron, acid and stencil, sand-grit and stencil, or tags.
May inspect items before marking. May attach gummed labels to merchandise,
material, or product, using tag dispensing machine. May clean items. May use
printing mechanism or labeling press. When marking is performed as task of
packaging duties, worker should be classified according to type of packaging
performed as PACKAGER, HAND (any industry) 920.587-018; PACKAGER, MACHINE (any
industry) 920.685-078; or BALING-MACHINE TENDER (any industry) 920.685-010.

GUIDE FOR OCCUPATIONAL EXPLORATION:  06.04.37

STRENGTH:  Light Work - Exerting up to 20 pounds of force occasionally
(Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10
pounds of force frequently (Frequently: activity or condition exists from 1/3 to
2/3 of the time) and/or a negligible amount of force constantly (Constantly:
activity or condition exists 2/3 or more of the time) to move objects.  Physical
demand requirements are in excess of those for Sedentary Work.  Even though the
weight lifted may be only a negligible amount, a job should be rated Light Work:
(1) when it requires walking or standing to a significant degree; or (2) when it
requires sitting most of the time but entails pushing and/or pulling of arm or leg
controls; and/or (3) when the job requires working at a production rate pace
entailing the constant pushing and/or pulling of materials even though the weight
of those materials is negligible.

  Reasoning:  Level 2 - Apply commonsense understanding to carry out detailed but
uninvolved written or oral instructions.  Deal with problems involving a few
concrete variables in or from standardized situations.

  Math:      Level 1 - Add and subtract two-digit numbers.  Multiply and divide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DICOT **920.687-126**  MARKER II

10's and 100's by 2, 3, 4, 5.  Perform the four basic arithmetic operations with coins as part of a dollar.  Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

Language:   Level 1 - READING: Recognize meaning of 2,500 (two- or three-syllable) words.  Read at rate of 95-120 words per minute.  Compare similarities and differences between words and between series of numbers.

WRITING: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

SPEAKING: Speak simple sentences, using normal word order, and present and past tenses.

SPECIFIC VOCATIONAL PREPARATION:  Level 2 - Anything beyond short demonstration up to and including 1 month
Data:     6 - Comparing
N - Not Significant
People:   8 - Taking Instructions-Helping
N - Not Significant
Things:   7 - Handling
S - Significant
Field 1:  192 - Imprinting
Field 2:  191 - Printing
Field 1:  541 - Blast Furnace, Steelworks, and Rolling and Finishing Mill Products (pig iron; steel ingots; basic iron and steel shapes, such as plates, sheets, strips, rods, bars, pipes, and tubing; and steel wire, cable, nails, spikes, staples, etc.)
Field 2:  619 - Miscellaneous Fabricated Products, n.e.c. (brooms, brushes, and paint rollers; signs and advertising displays, including neon signs and advertising novelties; burial caskets, casket linings, and burial vaults [except concrete]; hard-surface floor covering [ex- cept rubber and cork]; and candles, cigarette holders and smoking pipes, coin-operated amusement machines, embroidery kits, fire ex- tinguishers, globes, mannequins, matches, canes, umbrellas, etc.)
General Learning Ability:     Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability
Verbal Aptitude:              Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability
Numerical Aptitude:           Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability
Spacial Aptitude:             Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability
Form Perception:              Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability
Clerical Perception:          Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability
Motor Coordination:           Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability
Finger Dexterity:             Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability
Manual Dexterity:             Level 3 - Middle 1/3 of the Population
Medium Degree of Aptitude Ability
Eye-Hand-Foot Coordination:  Level 5 - Bottom 10% of the Population

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DICOT **920.687-126**  MARKER II

```
Markedly Low Aptitude Ability
Color Discrimination:        Level 4 - Lowest 1/3 Excluding Bottom 10%
Low Degree of Aptitude Ability
R:  Performing REPETITIVE or short-cycle work
Climbing:              Not Present  - Activity or condition does not exist
Balancing:             Not Present  - Activity or condition does not exist
Stooping:              Not Present  - Activity or condition does not exist
Kneeling:              Not Present  - Activity or condition does not exist
Crouching:             Not Present  - Activity or condition does not exist
Crawling:              Not Present  - Activity or condition does not exist
Reaching:              Constantly   - Exists 2/3 or more of the time
Handling:              Constantly   - Exists 2/3 or more of the time
Fingering:             Occasionally - Exists up to 1/3 of the time
Feeling:               Not Present  - Activity or condition does not exist
Talking:               Not Present  - Activity or condition does not exist
Hearing:               Occasionally - Exists up to 1/3 of the time
Tasting/Smelling:      Not Present  - Activity or condition does not exist
Near Acuity:           Occasionally - Exists up to 1/3 of the time
Far Acuity:            Not Present  - Activity or condition does not exist
Depth Perception:      Occasionally - Exists up to 1/3 of the time
Accommodation:         Occasionally - Exists up to 1/3 of the time
Color Vision:          Occasionally - Exists up to 1/3 of the time
Field of Vision:       Not Present  - Activity or condition does not exist
Exposure to Weather:   Not Present  - Activity or condition does not exist
Extreme Cold:          Not Present  - Activity or condition does not exist
Extreme Heat:          Not Present  - Activity or condition does not exist
Wet and/or Humid:      Not Present  - Activity or condition does not exist
Noise Level:           Level 4      - Loud
Vibration:             Not Present  - Activity or condition does not exist
Atmospheric Cond.:     Not Present  - Activity or condition does not exist
Moving Mech. Parts:    Not Present  - Activity or condition does not exist
Electric Shock:        Not Present  - Activity or condition does not exist
High Exposed Places:   Not Present  - Activity or condition does not exist
Radiation:             Not Present  - Activity or condition does not exist
Explosives:            Not Present  - Activity or condition does not exist
Toxic Caustic Chem.:   Not Present  - Activity or condition does not exist
Other Env. Cond.:      Not Present  - Activity or condition does not exist
```

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.